APPEAL,CLOSED,CONV,PURCELL,_SC

Email All Attys

Email All Attys and Secondary Emails

# U.S. District Court
# Western District of Oklahoma[LIVE] (Oklahoma City)
# CIVIL DOCKET FOR CASE #: 5:21−cv−00999−J

Redfearn v. Crow
Assigned to: Judge Bernard M. Jones
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 10/12/2021
Date Terminated: 03/23/2022
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question

**Petitioner**

**Jesse Dean Redfearn**
#423248

represented by **John M Dunn**
Law Office of John M Dunn PLLC
616 S Main St
Suite 206
Tulsa, OK 74119
918−526−8000
Fax: 918−359−5050
Email: jmdunn@Johndunnlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Director DOC Scott Crow**
*Director*

represented by **Caroline EJ Hunt**
Attorney General's Ofc−NE 21STREET−OKC
313 NE 21st St
Oklahoma City, OK 73105
405−521−3921
Fax: 405−522−4534
Email: fhc.docket@oag.ok.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 10/12/2021 | 1 | | PETITION for Writ of Habeas Corpus filed by Jesse Dean Redfearn. (Attachments: # 1 Civil Cover Sheet) (knt) (Entered: 10/12/2021) |
| 10/12/2021 | 2 | | BRIEF IN SUPPORT re 1 Petition for Writ of Habeas Corpus by Jesse Dean Redfearn. (Attachments: # 1 Exhibit 1 − Original Record, # 2 Exhibit 2 − Jury Trial Vol 1 of 5, # 3 Exhibit 3 − Jury Trial Vol 2 of 5, # 4 Exhibit 4 − Jury Trial Vol 3 of 5, # 5 Exhibit 5 − Jury Trial Vol 4 of 5, # 6 Exhibit 6 − Jury Trial Vol 5 of 5)(knt) (Entered: 10/12/2021) |

| | | | |
|---|---|---|---|
| 10/12/2021 | 3 | | NO PREVIOUS Cases. (knt) (Entered: 10/12/2021) |
| 10/12/2021 | 4 | | ENTER ORDER REFERRING CASE to Magistrate Judge Gary M. Purcell. Entered at the direction of Judge Bernard M. Jones on 10/12/2021. (knt) (Entered: 10/12/2021) |
| 10/13/2021 | 5 | | Receipt for Money Received from Jesse Dean Redfearn in the amount of $5, receipt number OKW500087600 regarding 1 Petition for Writ of Habeas Corpus (dtb) (Entered: 10/13/2021) |
| 10/14/2021 | 6 | | ORDER for Response re 1 Petition for Writ of Habeas Corpus filed by Jesse Dean Redfearn. Signed by Magistrate Judge Gary M. Purcell on 10/14/21. (lb) (Entered: 10/14/2021) |
| 10/20/2021 | 7 | | ENTRY of Appearance by Caroline EJ Hunt on behalf of Angela D Hearell (Hunt, Caroline) (Entered: 10/20/2021) |
| 11/15/2021 | 8 | | MOTION for Extension of Time to File Response/Reply as to 1 Petition for Writ of Habeas Corpus by Angela D Hearell. Motions referred to Gary M. Purcell. (Hunt, Caroline) (Entered: 11/15/2021) |
| 11/15/2021 | 9 | | ORDER granting 8 Motion for Extension of Time to File Response. Respondent shall file a Response to the Petition for Writ of Habeas Corpus no later than December 13, 2021. Signed by Magistrate Judge Gary M. Purcell on 11/15/2021. (cps) (Entered: 11/15/2021) |
| 12/13/2021 | 10 | | RESPONSE re 1 Petition for Writ of Habeas Corpus filed by Angela D Hearell. (Attachments: # 1 Exhibit 1 − Summary Opinion, # 2 Exhibit 2 − Appellant Brief, # 3 Exhibit 3 − Appellee Brief, # 4 Exhibit 4 − Preliminary Hearing, Nov. 16, 2018_Redacted, # 5 Exhibit 5 − Hearing, February 28, 2019, # 6 Exhibit 6 − Hearing, July 11, 2019, # 7 Exhibit 7 − Hearing, Aug. 15, 2019, # 8 Exhibit 8 − Hearing, Aug. 26, 2019, # 9 Exhibit 9 − Jury Trial, Vol. I, Sept. 16, 2019_Redacted, # 10 Exhibit 10 − Jury Trial, Vol. II, Sept. 17, 2019_Redacted, # 11 Exhibit 11 − Jury Trial, Vol. III, Sept. 18, 2019_Redacted, # 12 Exhibit 12 − Jury Trial, Vol. IV, Sept. 19, 2019_Redacted, # 13 Exhibit 13 − Jury Trial, Vol. V, Sept. 20, 2019_Redacted, # 14 Exhibit 14 − Relevant Pages)(Hunt, Caroline) (Entered: 12/13/2021) |
| 12/13/2021 | 11 | | NOTICE of Conventional Filing by Caroline EJ Hunt on behalf of Angela D Hearell (Hunt, Caroline) (Entered: 12/13/2021) |
| 12/13/2021 | 12 | | ENTER ORDER. Petitioner may reply to the Response Doc. 10 on or before January 3rd, 2021, if he so desires. Signed by Magistrate Judge Gary M. Purcell on 12/13/2021. (cps) (Entered: 12/13/2021) |
| 12/15/2021 | 13 | | STATE COURT RECORDS RECEIVED − CONVENTIONAL FILING by Scott Crow re 11 Notice of Conventional Filing. All records present as listed. Documents placed in two brown expandable folders and maintained in Court Clerk's Office File Room. (knt) (Entered: 12/15/2021) |
| 01/03/2022 | 14 | | REPLY to Response to Motion re 8 MOTION for Extension of Time to File Response/Reply as to 1 Petition for Writ of Habeas Corpus filed by Jesse Dean Redfearn. (Dunn, John) (Main Document 14 replaced on 1/5/2022 to correct signature error.) (km) (Entered: 01/03/2022) |
| 02/16/2022 | 15 | | |

| | | | |
|---|---|---|---|
| | | | REPORT AND RECOMMENDATION − It is recommended the Petition for a Writ of Habeas Corpus re Doc 1 brought pursuant to 28 U.S.C. § 2254 be DENIED. Objections to R&R due by 3/8/2022. This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied. Signed by Magistrate Judge Gary M. Purcell on 2/16/2022. (cps) (Entered: 02/16/2022) |
| 02/16/2022 | | | Magistrate Judge Gary M. Purcell no longer assigned to case. (cps) (Entered: 02/16/2022) |
| 03/08/2022 | 16 | | OBJECTION TO REPORT AND RECOMMENDATION 15 filed by Jesse Dean Redfearn. (Dunn, John) (Entered: 03/08/2022) |
| 03/23/2022 | 17 | | **ORDER ADOPTING REPORT AND RECOMMENDATION** ~ The Court ADOPTS the Report and Recommendation 15 and DENIES Petitioner's Petition for a Writ of Habeas Corpus 1 . Additionally, the Court DENIES a certificate of appealability. Signed by Judge Bernard M. Jones on 3/23/2022. (dwl) (Entered: 03/23/2022) |
| 03/23/2022 | 18 | | **JUDGMENT** ~ Pursuant to the Order adopting the Report and Recommendation, Petitioner's petition for a writ of habeas corpus is DENIED and a certificate of appealability is denied. Signed by Judge Bernard M. Jones on 3/23/2022. (dwl) (Entered: 03/23/2022) |
| 04/20/2022 | 19 | | NOTICE OF APPEAL as to 18 Judgment, 17 Order Adopting Report and Recommendation, by Jesse Dean Redfearn. (Attachments: # 1 Envelope)(km) (Entered: 04/20/2022) |

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

JESSE DEAN REDFEARN,

Petitioner,

v.

SCOTT CROW, Director,

Respondent.

No. CIV-21-999-J

REPORT AND RECOMMENDATION

Petitioner Jesse Dean Redfearn, a state prisoner represented by counsel, challenges his state court convictions in this 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus (Doc. No. 1) and Brief in Support (Doc. No. 2), with attached exhibits and excerpts from relevant transcripts. Respondent has filed his Response (Doc. No. 10), with attached exhibits and the relevant state court records. Petitioner has filed a Reply. Doc. No. 14. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended the Petition be denied.

I. Summary of Procedural Background

Petitioner was convicted of First-Degree Rape and Kidnapping, both after

former convictions of two felonies in Case No. CF-2018-4337, District Court of Tulsa County, Oklahoma. In accordance with the jury's recommendation, the trial court sentenced Petitioner to two terms of life imprisonment to be served consecutively. Doc. No. 2-1 at 344-46. Petitioner appealed to the Oklahoma Court of Criminal Appeals ("OCCA") raising eight issues: (1) whether the trial court denied him his constitutional right to confront witnesses against him when the trial court declared the victim/witness ("T.A.")[1] unavailable to testify; (2) whether the trial court denied his right to confrontation when it allowed T.A.'s preliminary hearing testimony to be read into the record even though defense counsel had not finished his preliminary hearing questioning before T.A. left the stand; (3) whether the trial court erred in its instruction on the range of punishment; (4) whether the district court judge erred in failing to recuse herself; (5) whether prosecutorial misconduct denied him a fair trial; (6) whether the evidence was sufficient to prove the crime of First-Degree Rape beyond a reasonable doubt; (7) whether his trial counsel was ineffective; and (8) whether an accumulation of error denied him a fair trial. Doc. Nos. 10-1; 10-2. The OCCA affirmed Petitioner's convictions. Doc. No. 10-1. Petitioner then filed the instant action seeking habeas relief based on three grounds.

[1] The Court will refer to the complaining witness as "T.A." as did Petitioner and Respondent.

In his first and third grounds for relief, Petitioner contends his Sixth Amendment right to confront witnesses against him and his right to due process were violated when the trial court erroneously declared the complaining witness to be "unavailable" and erroneously allowed her preliminary hearing testimony to be read into the trial transcript. Doc. No. 2 at 8-14; 16-20.[2] In his second ground for relief, Petitioner contends the evidence was insufficient to support his conviction for First-Degree Rape. *Id.* at 14-16.

II. Factual Introduction

At approximately 1:00 a.m. on the morning of June 19, 2018, two Tulsa police officers observed a person, who appeared to be a child, walking on the side of the road in an industrial area of Tulsa, Oklahoma. Doc. No. 10-11 at 24-26. Upon investigation, the two officers, Vernon McNeal and Jill (Jamagochin) Sallee, discovered the person was an adult woman, later identified as T.A, who was wearing a large garment, later determined to be a size 6X t-shirt, and her head and face were covered with a hood. [3]

---

[2] Respondent contends the third ground for relief is subject to anticipatory procedural bar. According to Respondent, Petitioner did not invoke his right to due process in his brief before the OCCA regarding his inability to cross-examine T.A. at trial. In his brief before the OCCA, however, Petitioner did in fact state that the absence of T.A. at trial "affected [Petitioner's] right to due process, not to mention his right to confrontation." Doc. No. 10-2 at 31. Though Petitioner's due process claim does not merit a separate discussion, all propositions of error are exhausted, and the Court need not apply anticipatory procedural bar.

[3] The shirt T.A. was wearing was long enough on her to be a dress. Detective Gregory

Officer McNeal activated his body camera, and a portion of the video was played for the jury. Officer McNeal then explained the video:

> What you saw is me exiting my vehicle, putting my body cam on, and then approaching the victim. As I approached, I tried to—one, I kind of wanted to see where her hands were, kind of—for officer safety I just want to know where people's hands are. And so I did not see any hands. I did not see anything. And as I got closer, I could see that her face was covered. So I pulled—I pulled the mask down and pulled up her shirt, and I could see that—just to see where her hands were. I wanted to make sure I knew where her hands were, and that is when I saw that her hands were bound behind her back and that she was completely nude.

Doc. No. 10-11 at 31.

T.A. testified at a preliminary hearing on November 16, 2018,[4] regarding what she could remember from the evening of June 18, 2018, and the early morning hours of June 19, 2018. Doc. No. 10-4 at 6-22. In sum, T.A. testified that on June 18, 2018, she had been wearing blue jeans, a spaghetti strap orange shirt, and blue and white flip flops. She was carrying a little black purse.[5] *Id.* at 11. T.A. remembered buying liquor at a liquor store in the vicinity of Sheridan and Admiral before walking to a nearby Budget Inn where she chatted with acquaintances while she looked for her

McClintock, assigned to investigate the case, described T.A. as "one of the tiniest women [Detective McClintock] had ever seen." Doc. No. 10-12 at 192. He described T.A. as under four foot tall and estimated her weight at 75 pounds. *Id.*

[4] At all times relevant to this action, T. A. was homeless and generally stayed around the area of Sheridan and Admiral in Tulsa, Oklahoma.

[5] T.A.'s clothing and purse were never found.

friend, Benny, with whom she sometimes spent the night. *Id.* at 9. When she left the Budget Inn, she crossed the street and headed toward a Family Dollar store behind which she intended to spend the night. Her path took her through the parking lot of an Arby's restaurant.

T.A. next remembered not being able to see. She testified that a mask was covering her eyes, a rope held two bandanas around her mouth, a belt was around her neck, and her hands were tied behind her back. *Id.* at 11-12.

Her next memory was of being washed in a bathtub or shower. When she screamed her friend's name, a cloth was shoved in her mouth, and the belt around her neck was tightened. She remembered a soft voice telling her repeatedly to shut up. At least twice, something that felt like a washcloth was shoved into her mouth to gag her. T.A. remembered someone's hands cleaning her with water from the chest down, touching her chest and vagina. *Id.* at 12-14, 15-19.

After she endured the bath, T.A. remembered being placed in a vehicle, being driven somewhere, being carried like a baby out of the vehicle, and being placed on the ground. *Id.* at 14-15. As she stood up and began to walk, she heard Officer Sallee call to her. Officer Sallee cut the rope binding T.A.'s hands. The officers then removed the items from her face and neck, collecting the rope, belt, and bandanas as evidence. *Id.* at 19-20.

After her hands were freed, T.A. found she was wearing a baby blue South

Pole t-shirt, big enough to be like a dress on her. *Id.* at 20. The officers summoned an ambulance to take T.A. to a hospital for examination. T.A. testified that she did not see the face of the person, but she felt his stomach which suggested he was overweight. *Id.* at 22.

On cross-examination, T. A. stated that she was questioned by the examining nurse and told the nurse that she did not remember whether there was vaginal or rectal penetration during her ordeal. When defense counsel asked T.A. if she had been engaged in an act of prostitution on the night of June 18, 2018, T. A. responded, "I'm done. I'm done," and she left the witness stand. Doc. No. 10-4 at 51. At the judge's suggestion, T. A. was taken to the jury room to regain her composure before further questioning. The prosecution was allowed to call its other witnesses. Defense counsel did not attempt to recall T.A. for further questioning, and T.A. did not return to the courtroom during the preliminary hearing.

Although the prosecution was able to find and question T. A. several times between the preliminary hearing and the trial, the prosecution moved to have T. A. declared "unavailable" because during several contacts with the prosecution, she voiced her reluctance to testify. Doc. No. 10-14 at 1-13. Over Defendant's objection, Doc. No. 10-14 at 14-28, the trial court ruled that T.A. was "unavailable," paving the way for her preliminary hearing testimony to be read into the trial record.

The Court will refer to other evidence of record and testimony as necessary

for a thorough discussion and analysis of Petitioner's grounds for relief.

III. Standard of Review of Constitutional Claims

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court cannot grant habeas relief with respect to a state prisoner's constitutional claim that was adjudicated on the merits in state court proceedings unless the state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The AEDPA directs courts to "ensure a level of 'deference to the determinations of state courts,' provided those determinations did not conflict with federal law or apply federal law in an unreasonable way." *Williams v. Taylor*, 529 U.S. 362, 386 (2000) (quoting H.R. Conf. Rep. No. 104-518, p. 111 (1996)).

Under this standard, a writ of habeas corpus will issue only if "a state court's application of federal law . . . is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (quotations omitted). Under this deferential standard, even a showing of "clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations omitted).

"[W]hether a state court's decision was unreasonable must be assessed in light

of the record the [state appellate] court had before it." *Holland v. Jackson*, 542 U.S. 649, 652 (2004). Consequently, federal habeas "review is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). In reviewing a state appellate court's decision, the state court's findings of fact are presumed correct and entitled to deference. 28 U.S.C. § 2254(e)(1).

IV. Confrontation Clause Issues

Petitioner contends his Sixth Amendment confrontation rights and his due process right to a fair trial were compromised because he was unable to cross-examine T.A. at trial. The trial court determined T.A. was "unavailable" to testify based on her unwillingness to do so and allowed the State to read T.A.'s preliminary hearing testimony into the record.

The Sixth Amendment of the United States Constitution guarantees an individual accused of a criminal offense the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court of the United States recently revisited the historical underpinnings of this "bedrock constitutional protection[]," applicable to the States through the Fourteenth Amendment. *Hemphill v. New York*, ___ U.S.___, 142 S. Ct. 681, 690 n.3 (2022) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)).

In *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), *overruled on other grounds by*

*Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the right to confrontation did not bar the admission of statements of an unavailable witness so long as those statements had "adequate indicia of reliability," meaning that they fell "within a firmly rooted hearsay exception" or otherwise bore "particularized guarantees of trustworthiness." (quotations omitted). Twenty-four years later, however, in *Crawford*, the Supreme Court rejected *Roberts'* reliability-based approach to the Confrontation Clause. As the *Hemphill* Court explained:

> In charting a different path, the *Crawford* Court examined the history of the confrontation right at common law and concluded that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.*, at 50, 124 S. Ct. 1354. The Court continued, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.*, at 53–54, 124 S. Ct. 1354. Because "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts," the requirement was "most naturally read" to admit "only those exceptions established at the time of the founding." *Id.*, at 54, 124 S. Ct. 1354; *see also Giles v. California*, 554 U.S. 353, 377, 128 S. Ct. 2678, 171 L.Ed.2d 488 (2008) ("declin[ing] to approve an exception to the Confrontation Clause unheard of at the time of the founding or for 200 years thereafter").

*Hemphill*, 142 S.Ct. at 690–91 (footnote omitted).

*Crawford* declined to comprehensively define the term "testimonial," but specifically stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing[.]" *Crawford*, 541 U.S. at 68. Thus,

*Crawford* forbids introduction of preliminary hearing testimony at trial unless the witness is unavailable to testify at trial, and the defendant previously had an adequate opportunity to cross-examine the witness. *Id.* at 57.

1. Unavailability of T.A. at Trial

Petitioner's trial was originally scheduled to begin August 26, 2019. That day, the State filed a motion for continuance or in the alternative to declare witness unavailable and use transcript at trial. Doc. No. 2-1 at 157. The motion outlined the steps the State or its representatives had taken to locate T.A. and convince her to testify at trial.

> T.A. was served with a subpoena on July 15, 2019, at approximately 7:15 a.m. by DA Investigator Eagan. On August 6, 2019[,] DA Investigator Eagan went to speak with T.A. and set up another meeting for August 12, 2019. On the 12th, DA Investigator Eagan found T.A., who was sick, dirty, had no shoes. The prosecutor and the victim witness advocate Heather Prater also spoke with T.A. and she was unsure whether she wanted to testify and was still debating the idea. Again on August 16, 2019, the prosecutor and victim witness advocate spoke with T.A., and at that date she was unsure about testifying and showed reluctance. On August 20th, the prosecutor, victim advocate, and Detective Marnie Waller traveled to the area in which the victim frequents as a homeless person and was unable to locate her. Later that afternoon, Detective Marnie Waller traveled to that area, located T.A. and was informed by her she had decided she wanted to testify. The prosecutor spoke with T.A. on the telephone and informed her they would go out to locate and meet with her again on August 22. On August 22, 2019, Heather Prater, Detective Waller, and the prosecutor traveled to the general area T.A. stayed in and were unable to locate her. On August 26[,] 2019, the prosecutor and DA Investigator Egan [sic] went to the area in which T.A. had informed she would be staying and were unable to locate her. T.A. additionally failed to appear per the subpoena on August 26, 2019.

Doc. No. 2-1 at 157-58. The trial court continued the trial to September 16, 2019, at which time the State renewed its motion to declare T.A. unavailable and to read the preliminary hearing testimony into the trial record.

The trial judge heard the State's motion on September 16-17, 2019. Doc. Nos. 10-9, 10-10. The State called two witnesses, Heather Prater, Director of the Victim Witness Center, and Liz Eagan, an investigator for the Tulsa County DA's office. Each testified, generally, that they had been able to locate T.A. on several previous occasions but that T.A. had never been definitive about testifying at trial. *Id.* The two testified that T.A. had been given the date of the trial and told she would probably need to appear on the third day. On cross-examination, Ms. Eagan testified that she had given T.A. her card with the date of trial written on it, but that no plans were made to secure T.A.'s attendance at trial. *Id.* at 47. The prosecutor informed the trial court that T.A. had recently been served with a subpoena. Doc. No. 10-9 at 81-82.

The defense called Megan Cullin, an investigator with the Public Defender's office. Ms. Cullen testified that she had been able to find T.A. the day before near the Budget Inn after driving around the area of Admiral and Sheridan for about 15 minutes. Cullen summarized the recorded conversation she had with T.A.

> She told me that she had contacted the DA's office or had been in contact with the DA's office prior to the trial date, and they had told her that it was going to get postponed. She was confused as to why they

> couldn't find her. She was aware that the DA's Office was attempting to find her and was unaware as to why they had not been able to find her. She also said that she was going to be testifying at the upcoming trial and knew the court date.

*Id.* at 51.

Ultimately, the trial judge granted the State's motion to declare T.A. unavailable.[6] Doc. No. 10-9 at 79-83.

> At least for purposes of today what I have is testimony under oath that she refuses to testify at the trial of this matter, albeit, it seems to be a back and forth idea for her.

*Id.* at 80. The trial court continued the hearing the next day. Doc. No. 10-10.

When the hearing continued, the State first informed the trial judge that, contrary to their assertion the day before, T.A. had not been served with a subpoena since July 15, 2019. *Id.* at 4. The State then declared it would stand on its motion regarding both the unavailability of T.A. and the sufficiency of cross-examination at the preliminary hearing.

Defense counsel argued against admission of T.A.'s preliminary hearing testimony, noting that the cross-examination at the preliminary hearing was cut short at a crucial moment.

> [A]s crucial to the defense in this case, [T.A.] admittedly lives and stays at the Best Budget Inn down in this area of Admiral and Sheridan. It is a known hot spot for prostitution. Tudor House and Best Budget Inn are

[6] The trial court relied on two sections of Oklahoma State law, Okla. Stat. tit. 12, § 2804(A)(2), (A)(5), both of which require the prosecution to demonstrate an inability to procure a witness by process or other reasonable means. Doc. No. 10-9 at 80-81.

> known for prostitution and dope. Police officers would acknowledge that. In fact, the officers in this case, through some of their questions, they acknowledge that at the time. That is a crucial issue because, clearly, consent is relevant in a rape case as is kidnapping.

Doc. No. 10-10 at 6-7.

The trial court re-affirmed its finding that T.A. was unavailable to testify. Further, the trial court found the State had made a good-faith effort to secure T.A.'s attendance at trial.

> [F]irst of all, I am considering[,] in determining the unavailability [of T.A.,] the testimony from the witness stand from three witnesses. I don't have any other sworn testimony to consider other than the testimony from Heather Prader [sic], Liz Egan [sic] and Megan Colan [sic], and so that is what this decision is based upon.
>
> . . . .
>
> [G]iven the circumstances of her living conditions, and whether she can be found from time to time, and the fact that there is no absolute requirement that the State have her subpoenaed as a witness to show that they have, in fact, made good faith efforts to secure her testimony for trial, I am going to stay with my ruling on unavailability.
>
> . . . .
>
> So based on the testimony that I heard yesterday and in taking into consideration what I read in the preliminary hearing transcript from this witness, she indeed appears to be an uncooperative witness that changes her mind with frequency . . . . I have determined that the State can use the . . . preliminary hearing transcript of her testimony.

Doc. No. 10-10 at 12-14.

"[T]o prove that prior testimony falls within the unavailability exception to the Confrontation Clause, the government must show it made a good-faith effort to

obtain the witness's attendance at trial. The Confrontation Clause expresses a preference for face-to-face confrontation." *Cook v. McKune*, 323 F.3d 825, 832 (10th Cir. 2003) (citing *Roberts*, 448 U.S. at 74). Whether the government has made a good-faith effort is "a question of reasonableness." *Cook*, 323 F.3d at 835.

Whether T.A. was actually unavailable to testify was again called into question the morning after the transcript of her preliminary hearing testimony was read into the transcript of Petitioner's trial. Doc. No. 10-11 at 176-214. The defense notified the trial court that the prosecution had informed them about a phone call from T.A. T.A. had called the prosecution the day before, stating that she wanted to testify. The prosecutor stated on the record that around 6:00 p.m., after court had recessed for the day, she had noticed a missed call from Jubilee Liquor store. When she listened to the message, left at 2:21 p.m., she found it was from T.A. stating that she wanted to testify. The message was played and included in the record.

> Hi, DeeDee. This is [T.A.]. I was calling—if you can—I want to testify. I don't know if it is too late or not, and—but if you can call me back at my mother's phone, 918-932-6671, and I'll check in with her. All right. Thank you.

Doc. No. 10-12 at 7. The defense argued for a mistrial, noting that T.A. was available, but that if she testified at that point, the jury would have heard her testimony twice and the defendant would be prejudiced. The trial court declined to declare a mistrial.

The OCCA addressed the issue of availability of the witness on direct appeal,

noting that Oklahoma law requires a showing that the State exercised due diligence and good faith in trying to secure T.A.'s testimony. Doc. No. 10-1 at 5. The OCCA explained,

> A finding of due diligence in this context requires more than simply the issuance of a subpoena for the witness but does not require that every possible avenue for locating the missing witness be exhausted. We look to all relevant facts to see whether the State has established good faith diligence.

*Id.* at 5-6 (citations omitted). Even though the OCCA cited Oklahoma law in its analysis, it is apparent that the standard it applied was the same as that established by Supreme Court law.

Applying this standard, the OCCA held:

> The detailed evidence presented by the State regarding its attempts to locate the victim prior to and during trial was more than adequate to support the trial court's findings regarding the victim's unavailability and the State's due diligence. The ruling that the victim was unavailable was not an abuse of discretion and did not violate Redfearn's constitutional right to confrontation. Relief is not required.

Doc. No. 10-1 at 6.

The OCCA found no abuse of discretion in the trial court's determination that T.A. was "unavailable" to testify. As defense counsel argued, the State undoubtedly could have taken additional steps to secure T.A.'s testimony. That said, the OCCA's conclusion was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. What is more, the OCCA's decision that T.A. was unavailable to testify was not based upon an unreasonable determination of the facts

in light of the evidence presented in the state court proceeding.

2. Admission of Preliminary Hearing Testimony

The OCCA also considered whether the trial court erred in allowing the State to read T.A.'s preliminary hearing testimony into the record:

> Redfearn argues generally that the right to confrontation is violated when the scope of cross-examination at preliminary hearing is limited to the issue of whether probable cause existed to bind the accused over for trial. He complains specifically[] that defense counsel's right to cross-examine the victim was additionally impeded because the victim left the witness stand during cross-examination at preliminary hearing and counsel was not given the opportunity to complete the cross-examination. He asserts that the combination of the limited scope of cross-examination at preliminary hearing coupled with the abbreviated cross-examination of the victim violated his right to confrontation.

Doc. No. 10-1 at 8. The OCCA set forth the law governing its decision:

> When a defendant is provided an opportunity to cross-examine the witness and avails himself of that opportunity at a prior hearing, the confrontation clause is satisfied and a transcript of the prior hearing is admissible.[7]

Doc. No. 10-1 at 7 (alteration omitted). The OCCA emphasized that the constitutional guarantee of the Sixth Amendment is a prior *opportunity* to effectively cross-examine the absent witness:

> "[T]he Confrontation Clause guarantees the *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." [*Knapper v. State*, 473 P.3d 1053, 1068 (Okla. Crim. App. 2020)] (quoting

[7] The OCCA cited both Oklahoma law and Supreme Court law, including *Crawford*, 541 U.S. at 68, *Willis v. State*, 406 P.3d 30, 34 (Okla. Crim. App. 2017), and *Stouffer v. State*, 147 P.3d 245, 266 (Okla. Crim. App. 2006).

> *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original)). "Prior testimony is admissible so long as the defendant was not 'significantly limited' in his cross-examination." *Id.* This is so even though the preliminary hearing "is ordinarily a less searching exploration into the merits of a case than a trial[.]" *Id.* (quoting *California v. Green*, 399 U.S. 149, 165-66 (1970)).

Doc. No. 10-1 at 7-8.

The OCCA held that Petitioner's counsel had been given sufficient opportunity to cross-examine T.A. at the preliminary hearing, that the cross-examination was not limited to the narrow purposes of determining probable cause, and that nothing precluded defense counsel from recalling T.A. to the stand to continue his cross-examination. Though the possibility that T.A. was involved in an act of prostitution could have had a bearing on the issue of consent to the rape charge, the OCCA's determination that the preliminary hearing transcript was properly entered into evidence was neither contrary to, nor an unreasonable application of, Supreme Court law to the facts in this case. Additionally, the OCCA's determination of the facts based upon the trial evidence was reasonable. Thus, habeas relief is not warranted on Petitioner's first or third grounds for relief.

V. <u>Sufficiency of the Evidence</u>

Petitioner challenges the sufficiency of the evidence presented at trial to support his conviction for First-Degree Rape. According to Petitioner, "there is simply no evidence to show that T.A. had sex, had nonconsensual sex, or that the nonconsensual sex was with [Petitioner]." Doc. No. 2 at 16.

T.A. stated at various times that she did not think she was raped and that she did not remember being raped. Presuming without deciding that T.A. was raped, the record does not contain any direct evidence tying Petitioner to a rape. Thus, the police developed, and the prosecution relied on, circumstantial evidence to support the charge of First-Degree Rape. On direct appeal, the OCCA found the circumstantial evidence presented at trial sufficient to support Petitioner's conviction on the rape charge. Doc. No. 10-1 at 14-15.

1. Preliminary Investigation

T.A.'s case was assigned to Detective Gregory McClintock for investigation. His investigation included going to the location where the officers found T.A. and visiting businesses in that area to determine whether they had surveillance cameras. Doc. No. 10-12 at 166-68, 170-71. There were no surveillance tapes covering the area.

Detective McClintock located T.A. and interviewed her. *Id.* at 172-73. Without objection from the defense, Detective McClintock narrated a description of T.A.'s answers to his questions:

> [T.A.] told me that she was—she told me that she had went to the Jubilee Liquor Store on Admiral and after that she went to the Best Budget Inn and she hung out there. Her friend, Bennie, stays there and sometimes she is lucky enough to be able to stay inside at Bennie's house. And then she said from there she was going to walk to the Family Dollar, which is at 700 North Sheridan, which is, you know, approximately eight blocks north of the intersection of Admiral and Sheridan, and she told me that she was going to walk to the Family

Dollar because she sleeps behind the Family Dollar at times and she was going to go there to sleep.

And she told me the last thing she remembered was she was—had left the Best Budget Inn and she walked north, because she was going north, which was where Family Dollar is, and she was in the Arby's parking lot, and she said that is the last area she remembered being in, and then she told me that somebody came up behind her and put a hood on her face. And she described this person as being chubby, big and chubby, because she told me that she could feel the individual's stomach pushed up against her back because the person came up behind her and put a hood on her.

And she told me the next thing she remembered was waking up and she was completely naked and she had a hood on her face over her head. She said she had a cloth or something in her mouth that was gagging her where she really couldn't speak words, and that her hands were tied behind her back.

And I was asking her a lot of questions, because, you know, I was—I was just trying to find this person who did this to her. And I asked her, you know, what kind of vehicle were you in when you—when you went from—or how did you get to this place? She couldn't—she couldn't tell me. I asked her if the person carried her upstairs or downstairs, you know, just trying to, you know, help me in my investigation. Well, because if she would have told me she went upstairs maybe I am, you know, going to start looking at motels or apartments.

I was asking her about distinct smells. She didn't remember. You know, I asked her about, you know, any noises that she remembered, maybe train tracks or airplanes or something. I just wanted something. I wanted to know where this happened.

And—but anyway she told me that she woke up and she was—she was completely naked, and she was bound and gagged and a hood over her face, and that someone placed her into a shower. And I asked her about the shower. And she thought it had a plastic bottom. And she believed that it was a bathtub with, you know, a shower nozzle, and that—you know, that the individual was washing her and to include her

> vaginal area. And she—you know, she told me she kept screaming and kicking and screaming and kicking and this person just kept telling her to shut, up, to shut up, to shut up. And, you know, she told me that this person sounded white. She thought it was a white male that was chubby and that had—was very soft-spoken.[8]
>
> So then she said after that that this—and she told me—she just—you know, she was crying. She goes—you know, and she is apologizing. I just can't remember. And I kept trying to ask her questions. I mean, do you know what kind of—do you know if you were in a car or a van or a truck, because I wanted a car, van or truck to go look for. I want a suspect vehicle to go look for. But, you know, she had a hood over her face so she didn't know.[9]

*Id.* at 173-76.

Detective McClintock procured evidence from security cameras in the area where T.A. last remembered being on the evening of June 18, 2018. Detective McClintock testified that a surveillance video showed T.A. at the Jubilee Liquor Store. A surveillance video from the Best Budget Inn also corroborated T.A.'s story. The last surveillance video relevant to this case was from the Arby's time stamped at 10:47 p.m., which also depicted T.A. as she had described. The videos did not, however, show T.A.'s abduction. *Id.* at 179-82.

---

8 Detective McClintock interviewed Petitioner on July 10, 2018. At that time, according to Detective McClintock, Petitioner weighed over 350 pounds. He described Petitioner's voice as very soft, articulate, and intelligent. *Id.* at 187.

9 At this point, the defense objected to the narrative form of the testimony. The trial court sustained the objection but gave no instruction to the jury.

2. DNA Evidence

Officers McNeal and Sallee collected as evidence the items removed from T.A.—the rope from around her wrists, the hood/mask that had been over her head, two bandannas from around her mouth, and the belt from around her neck. Doc. No. 10-11 at 36-40. The officers then called an ambulance to transport T.A. to Hillcrest Hospital for a sexual assault examination, conducted by Tara Wyre, a Sexual Assault Nurse Examiner ("SANE"). *Id.* at 65, 147.

Before conducting the exam, the SANE nurse asked T.A. what had happened to her and testified as to what T.A. told her.

> She had been close to Arby's. I guess that was close to Admiral and Sheridan. She had been drinking. She suffers from some substance abuse, so she had been drinking some—what she said KD, which is, I guess is Kentucky Deluxe whiskey, and then she didn't remember a lot. She just remembered a cloth being in her mouth, something put over her face, her hands tied behind her back. She did remember being bathed. And then she remembers being left on the side of the road.

*Id.* at 149**.** When Ms. Wyre asked if she had been raped or sexually assaulted, T.A. "was unsure on everything" and "said she doesn't remember." *Id.* at 169.

The SANE nurse documented the findings she made when she conducted the examination. She could see a one-centimeter tear of the fossa navicularis, an area located behind the posterior fourchette of the vagina. She stated it "was more than likely an active bleed," despite the bath T.A. had endured. She found blood deposits on the sides of each labium and in the area of the vaginal vault. *Id.* at 160-62, 163.

Ms. Wyre testified that such a tear was consistent with blunt force trauma and agreed with the prosecutor's question that it could have been blunt force trauma from something like a penis. She further testified that such a tear is rarely seen "outside the SANE room." *Id.* at 163.

Ms. Wyre collected forensic data for later analysis by swabbing T.A.'s mouth, breasts, lower abdomen, and her external and internal genitalia. *Id.* at 165. That evidence, along with the t-shirt, rope, belt, mask, and bandannas, were submitted to the Tulsa Police Department's forensic laboratory for testing.

Sara Hart, an employee at the forensic laboratory, testified that she had analyzed the evidence for serology—that is, Ms. Hart performed testing to determine, presumptively, the possible presence of biological fluids. Doc. No. 10-12 at 87. The swabs from T.A.'s anus, external genitalia, and vagina returned presumptive positive results for semen and blood. *Id.* at 90-92. The swab of the victim's lower abdomen returned a presumptive positive result for semen, and the swab of the breasts returned a presumptive positive for saliva. *Id.* at 90. The t-shirt returned a presumptive positive result for semen and blood. *Id.* at 92, 96. Ms. Hart detected blood on the mask and belt. *Id.* at 96-97. She prepared the evidence she had screened and found presumptively positive for biological fluids for subsequent DNA testing. *Id.* at 92-95.

Catherine Worthen, technical manager of the biology section of the Tulsa

Police Department forensic laboratory, testified that she had reviewed the DNA test results conducted by a different forensic scientist, Tiffany Dire, who was not available to testify. Ms. Worthen explained that, when processing a sample, T.A.'s DNA information was removed from the sample and the remaining DNA, if any, was processed for comparison with other data. Doc. No. 10-12 at 102-03, 136. Specifically, the samples were compared to known samples from Petitioner collected after his arrest. *Id.* at 103. Ms. Worthen explained that when the previous scientist made her DNA comparisons, "she would look at the evidence samples and then look at the references that were submitted in this case. She would determine whether the reference profile from anyone in the case is consistent with the evidence profile." *Id.* at 109. Ms. Worthen explained that when a match from a piece of evidence was found, Ms. Dire would have estimated the rarity of the evidence profile. Ms. Worthen further explained that the "estimate of the rarity of the evidence profile . . . is the estimate of if you were to randomly select someone in the population, that they would also exhibit the DNA profile seen in the evidentiary sample." *Id.* at 111.[10]

[10] Ms. Worthen's testimony was far from clear. But an example she gave further clarified the significance of the DNA evidence. Ms. Worthen testified that a DNA sample collected from Petitioner's vehicle, as expected, matched that of Petitioner. Ms. Worthen testified Petitioner could not be excluded as a contributor to the DNA, and the probability of selecting another Caucasian individual at random who could have contributed the DNA was one in 260 trillion. Doc. No. 10-12 at 110-11. The remainder of Ms. Worthen's testimony was couched in terms of statistical probability that another Caucasian person could have contributed the DNA to the item of evidence.

Ms. Worthen testified that after T.A.'s DNA information was subtracted, swabs from the SANE examination either yielded no information about a second contributor or insufficient information to test for DNA. *Id.* at 118.

As for the swabs taken from different areas of the belt, however, sufficient information existed for testing, and Ms. Worthen testified that Petitioner could not be excluded as a contributor. From the tail of the belt, the DNA tested did not exclude Petitioner as a potential contributor. The probability of selecting a random Caucasian with the same DNA profile was one in forty-four. *Id.* at 125. Petitioner was also not excluded as a potential contributor to the DNA from the belt buckle. The statistical probability of selecting a random Caucasian individual with the same profile was one in 87,000. *Id.* at 125-26. From the middle of the belt, however, the DNA collected was not as compelling. Although Petitioner could not be excluded as a contributor, the probability of selecting a random individual with the same profile as the person whose DNA was on the item was one in two. *Id.* at 127.

The DNA test on the outside of the mask yielded convincing results implicating Petitioner. The DNA profile did not exclude Petitioner, and the probability of selecting another Caucasian individual at random with the same DNA profile was one in 3.6 million. *Id.*

Also convincing were the results of the DNA tests from the two bandannas. The sample from the blue bandana did not exclude Petitioner, and the probability of

finding a random Caucasian with the same profile as the contributor of the DNA was one in 29 trillion. The DNA from the red bandana also did not exclude Petitioner, and the probability of finding a random Caucasian with the same DNA profile as the contributor of the DNA was one in 19,000. *Id.* at 127-30.

Detective McClintock testified he came to regard Petitioner as a suspect because "his DNA was located on the belt that was around [T.A.'s] neck, and his DNA was located on the bandannas that were in her mouth, and his DNA was on the hood that was over her face[.]" *Id.* at 192. Detective McClintock acknowledged, however, that the sexual assault examination conducted by the SANE nurse yielded no seminal fluid that could be traced to Petitioner. *Id.* at 197.

3. Evidence from Searches

The DNA evidence on the items found on T.A. led police to suspect Petitioner.[11] Christine Gardner, a detective assigned to the special victims' unit of the Tulsa Police Department, assisted in executing a search warrant of Petitioner's residence where he lived alone. Doc. No. 10-12 at 40. Detective Gardner photographed relevant items found during the search. She testified that she photographed a small pair of jeans found in a laundry room closet. *Id.* at 46-47. She

[11] The forensic scientists actually matched the DNA found on the objects taken from T.A. to a sample in their DNA data bank. This information was not presented to the jury because it would have implicated Petitioner in previous crimes and been prejudicial to the defense. In fact, the trial court granted the defense's pre-trial motion *in limine* to preclude testimony regarding the "hit" in their data base that implicated Petitioner. Doc. No. 2-1 at 135.

photographed a roll of duct tape found in the master closet, two pieces of which had been ripped off and stuck to a closet shelf. *Id.* at 49. Detective Gardner photographed a size 6XL t-shirt and a backpack hanging in the master bedroom closet. The backpack contained duct tape and a braided cloth belt "with metal loops like the one found on [T.A.]'s neck" *Id.* at 49, 54-55; Doc. No. 10-13 at 94. Detective Gardner photographed a box of latex gloves found in the top drawer in a dresser in the master bedroom. Doc. No. 10-12 at 52.

After Petitioner's arrest, Detective Matthew Ferrell executed a search warrant of Petitioner's vehicle, a white Cadillac. Detective Ferrell found and seized as evidence an operable stun gun from the driver's side door and three towels which reacted positively to an ultraviolet-light tool used to detect semen, saliva, urine, and fibers. Officers swabbed the interior and exterior of the vehicle. Doc. No. 10-12 at 64-65, 67-69, 71. Items collected from the car tested positive for Petitioner's DNA, but negative for T.A.'s DNA. *Id.* at 106-09, 112-17.

Petitioner was arrested July 10, 2018. Petitioner waived his rights and Detective Gregory McClintock interviewed him. Doc. No. 10-12 at 36-39, 187-89. During the interview, which was recorded and played for the jury, Detective McClintock showed Petitioner a photograph of T.A. that had been taken at the SANE exam. *Id.* at 190-92. Before Detective McClintock had asked a question about it, Petitioner announced that he did not know the victim. Petitioner also denied being

in the area of Admiral and Sheridan, picking up girls that he did not know and giving them rides, and ever seeing T.A. or her being inside his car. *Id.* at 192-94.

However, Petitioner made two incriminating recorded phone calls from jail, both of which were played for the jury. The first phone call, on July 13, 2018, was with his grandmother - he told her that he had done something "stupid" and stated that "she was a prostitute." *Id.* at 201.

Detective McClintock described the significance of the phone call to his investigation:

> Well, when I had the opportunity to speak with Jesse Redfearn, he denied everything . . . . And now his story has changed[,] and he is talking to his grandmother and tells his grandmother that what he did was stupid and that she was a prostitute. And so now he goes from not knowing her to never picking up girls that he doesn't know to now all of the sudden he knows her and what he did was stupid, and now he is claiming that she is a prostitute.

*Id.* at 201-02.

The second call was recorded on July 27, 2018. The second call was with a person named Wendy and was about execution of the search warrant on Petitioner's car. After the recording of the phone call was played for the jury, Detective McClintock explained why this conversation was relevant to his investigation:

> Well, the individual that he is talking to, I believe that is Wendy, they are talking about Jesse's car, which was impounded by the police and a search warrant was conducted on that, and she was trying to get some property out of it and she tells Jesse that they dusted it for prints, and he tells her that is—you know, that is fine, that, you know, that she was in the car. So, again, he is admitting now that T.A. was in the car

> but talking to me we know the story. He lied and denied everything. And then they talk about her disappearing and hoping that she disappears, and if she does disappear[,]they'll have to let him go and that is—that is what he is hoping for. And he also says that he might do some time for this.

*Id.* at 202-03.

Petitioner raised sufficiency of the evidence on direct appeal. The OCCA set forth the state law standard of review for such claims:

> This Court reviews challenges to the sufficiency of the evidence in the light most favorable to the State and will not disturb the verdict if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.
>
> . . . .
>
> Pieces of evidence must be viewed not in isolation but in conjunction, and we must affirm the conviction so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded the defendant was guilty beyond a reasonable doubt.

Doc. No. 10-1 at 14-15 (quotations omitted).

The OCCA defined the elements of First-Degree Rape and concluded the evidence was sufficient to support Petitioner's conviction:

> [T]he State was required to prove that [Petitioner] had sexual intercourse with the victim, who was not his spouse, where force or violence was used or threatened against the victim, and [Petitioner] had the apparent power to carry out the threat of force or violence. The circumstantial evidence supporting the charge of rape against [Petitioner] was extremely strong. The evidence presented at trial was sufficient to prove each of these elements beyond a reasonable doubt. This proposition is denied.

*Id.* at 15 (citations omitted).

This Court agrees with the OCCA's conclusion regarding the sufficiency of the evidence. Although the OCCA cited state law, the standard is the same as that set forth by the Supreme Court:

> We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Jackson v. Va.*, 443 U.S. 307, 324 (1979).

What is more, the two layers of judicial deference given to claims challenging the sufficiency of the evidence establishes a "high bar in federal habeas proceedings[.]" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). *Coleman* explained:

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Id.* (quotations and citations omitted). Federal habeas courts must look to state law for the substantive elements of the criminal offense, but "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Id.* at 655.

The circumstantial evidence supporting Petitioner's conviction on the charge

of First-Degree Rape is compelling. A reasonable jurist could have concluded, based on the condition in which T.A. was discovered, that her abductor's motive was sexual. Though no DNA evidence was discoverable from the SANE examination, the SANE nurse did discover an injury consistent with blunt force trauma, the swabs of T.A.'s body were presumptively positive for biological fluids even though there was not enough evidence remaining for DNA testing. A reasonable jurist could conclude that the bath T.A. endured destroyed the evidence that could have been tested for DNA. Finally, Petitioner's recorded phone calls after his arrest clearly implicated him in illegal activity.

For these reasons, this Court recommends denial of habeas relief. The OCCA's decision is neither contrary to, nor an unreasonable application of Supreme Court law and was not an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

RECOMMENDATION

Based on the foregoing findings, it is recommended the Petition for a Writ of Habeas Corpus brought pursuant to 28 U.S.C. § 2254 be DENIED. Petitioner is advised of his right to file an objection to this Report and Recommendation with the Clerk of this Court by March 8th, 2022, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. *Moore v. United States*

*of America*, 950 F.2d 656 (10th Cir. 1991); *cf. Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this 16th day of February, 2022.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JESSE DEAN REDFEARN,<br><br>Petitioner,<br><br>v.<br><br>SCOTT CROW,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-21-999-J |

**ORDER**

Petitioner, Jesse Dean Redfearn, a state prisoner, filed a Petition pursuant to 28 U.S.C. § 2254, seeking habeas relief from a state court conviction. [Doc. No. 1]; Brief in Support of Petition for Writ of Habeas Corpus (Petr.'s Br.) [Doc. No. 2]. The matter was referred for initial proceedings to United States Magistrate Judge Gary M. Purcell consistent with 28 U.S.C. § 626(b)(1)(B), (C). Judge Purcell issued a Report and Recommendation recommending that the Petition be denied (Rep. & Rec.) [Doc. No. 15] and Petitioner has objected (Petr.'s Obj.) [Doc. No. 16], triggering de novo review.

## I. Background

Petitioner was convicted of First Degree Rape and Kidnapping. Petitioner appealed to the Oklahoma Court of Criminal Appeals (OCCA) raising multiple issues, including those raised here. The OCCA affirmed Petitioner's convictions and Petitioner then filed the instant action.

Petitioner objects to Judge Purcell's Report and Recommendation on the grounds that his rights under the Confrontation Clause have been violated, as well as his right to due process. With respect to all of Petitioner's objections raised before this Court, the OCCA adjudicated Petitioner's claims on the merits. Thus under the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act, the Court may grant habeas relief only if the OCCA's adjudication

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2). Additionally, "a state court's factual findings are presumed correct, and the petitioner bears the burden of rebutting that presumption by 'clear and convincing evidence.'" *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (citing 28 U.S.C. § 2254(e)(1)).

## II. Petitioner's Objections Related to the Confrontation Clause

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, provides the accused the right to be confronted with witnesses against him. The Clause prohibits the admission of testimonial hearsay against a defendant unless (1) the declarant is "unavailable" at trial and (2) the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Petitioner asserts his rights were violated when the trial court determined Petitioner's victim, T.A., was unavailable to testify at his trial, and permitted the transcript of her preliminary hearing testimony to be entered into evidence.

### A. Unavailability

The clearly established Supreme Court law for unavailability is that "[a] witness is not 'unavailable' for purposes of the . . . exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain [her] presence at trial." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (internal quotation marks and emphasis omitted). "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." *Id*. (internal quotation marks and ellipses omitted). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." *Id*. Applying this law, the OCCA found "more than adequate [evidentiary] support" for the trial

court's findings "regarding the victim's unavailability and the State's due diligence" in "its attempts to locate the victim prior to and during trial." OCCA Summary Opinion (OCCA Op.) [Doc. No. 10-1] at 6. The OCCA concluded that the trial court's ruling that the victim was unavailable "was not an abuse of discretion and did not violate [Petitioner's] constitutional right to confrontation." *Id.*

To prevail on his objections, Petitioner must establish that the OCCA unreasonably applied clearly established Supreme Court law when it concluded the State engaged in good-faith diligence in its efforts to produce T.A. at trial or that the OCCA's finding that T.A. was unavailable was an unreasonable determination of the facts. Petitioner has not established either.

Petitioner's primary objection is that "T.A. was absent by her own choice." Petr.'s Obj. at 3. Be that as it may, the OCCA determined that T.A. was unavailable when she did not appear at trial. OCCA Op. at 3-6; Rep. & Rec. at 10-16 (recounting evidence presented to the OCCA regarding T.A.'s non-attendance at trial and OCCA's determination of unavailability). And Petitioner has not established that this was an unreasonable determination of the facts. *See* Petr.'s Obj. at 2-4; Petitioner's Reply (Petr.'s Rep.) [Doc. No. 14] at 2-6; Petr.'s Br. at 3-14, 16-20.

As to whether the State made a good-faith effort to produce T.A. at trial, which is a question of reasonableness, the OCCA determined the State's efforts were sufficient to meet the requirement of good faith. OCCA Op. at 3-6; Rep. & Rec. at 10-16 (recounting evidence presented to the OCCA regarding the State's efforts and the OCCA's determination of sufficiency); *see also Roberts*, 448 U.S. at 74 (holding prosecution must make a good faith effort to obtain the witness). And Petitioner has not established the OCCA's determination was unreasonable. *See* Petr.'s Obj. at 2-4; Petr.'s Rep. at 2-6; Petr.'s Br. at 4-14, 16-20. As such, the Court adopts Judge Purcell's

Report and Recommendation regarding the OCCA's finding that T.A. was unavailable and its determination regarding the State's efforts to produce her for trial.

**B. Prior Opportunity to Cross-Examine**

To the extent Petitioner asserts a violation of the Confrontation Clause due to a lack of opportunity to cross-examine T.A., *see* Petr.'s Obj. at 3-4, the OCCA determined Petitioner's counsel had been given sufficient opportunity to cross-examine T.A. at the preliminary hearing. OCCA Op. at 6-9; Rep. & Rec. at 4-6, 11-14, 16-17 (recounting evidence presented to the OCCA regarding the preliminary hearing and the trial court's admission of the transcript into evidence); *see also Crawford*, 541 U.S. at 59 (discussing the requirement for unavailable witnesses that "the defendant has had a prior opportunity to cross-examine"). Petitioner has not established the OCCA unreasonably applied clearly established Supreme Court law when it made such determination and concluded the preliminary hearing transcript was properly entered into evidence, or that such determination was an unreasonable determination of the facts. *See* Petr.'s Obj. at 3-4; Petr.'s Rep. at 2-6; Petr.'s Br. at 4-14. As such, the Court adopts Judge Purcell's Report and Recommendation regarding the OCCA's determination that the preliminary hearing transcript was properly entered into evidence.

**III. Petitioner's Objections Related to Due Process and the Sufficiency of the Evidence**

Petitioner next asserts his right to due process under the Fifth and Fourteenth Amendments was violated because there was insufficient evidence to satisfy the elements of First Degree Rape. In considering a challenge to the sufficiency of the evidence relied upon for a state court conviction, the Supreme Court has established "the minimum amount of evidence that the Due Process Clause requires to prove the offense." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Specifically, under *Jackson v. Virginia*, 443 U.S. 307 (1979), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also id.* at 324.

The OCCA reviewed Petitioner's claims regarding the circumstantial evidence relied upon at trial, as well as the sufficiency of such evidence to satisfy the elements of the crime of First Degree Rape. OCCA Op. at 14-15; Rep. & Rec. at 17-30 (recounting evidence presented to the OCCA regarding the circumstantial evidence supporting the First Degree Rape charge). Applying the relevant standard, the OCCA determined the circumstantial evidence supporting the charge was "extremely strong" and the "evidence presented at trial was sufficient to prove each of [the required] elements beyond a reasonable doubt." OCCA Op. at 14-15. Petitioner has not established the OCCA unreasonably applied clearly established Supreme Court law when it made these determinations, or that such determinations were unreasonable determinations of the facts. *See* Petr.'s Obj. at 4-6; Petr.'s Rep. at 6-9; Petr.'s Br. at 14-16. As such, the Court adopts Judge Purcell's Report and Recommendation regarding the OCCA's decision regarding the sufficiency of the evidence supporting the rape charge.

## IV. Conclusion

Having carefully reviewed the Petition and Brief in Support, record, Report and Recommendation, and Petitioner's objections de novo, the Court agrees with Judge Purcell's thorough and well-reasoned analysis. Accordingly, the Court ADOPTS the Report and Recommendation [Doc. No. 15] and DENIES Petitioner's Petition for a Writ of Habeas Corpus [Doc. No. 1]. Additionally, the Court DENIES a certificate of appealability as the Court concludes Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Judgment will enter separately.

IT IS SO ORDERED this 23rd day of March, 2022.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JESSE DEAN REDFEARN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. CIV-21-999-J |
| | ) | |
| SCOTT CROW, | ) | |
| | ) | |
| Respondent. | ) | |

**JUDGMENT**

Pursuant to the Order adopting the Report and Recommendation, Petitioner's petition for a writ of habeas corpus is DENIED and a certificate of appealability is denied.

ENTERED this 23rd day of March, 2022.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

United States District Court for the
Western District of Oklahoma

FILED
APR 20 2022
CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY ___ DEPUTY

Jesse Dean Redfearn
v.
Scott Crow

Case # CIV-21-999-J

"NOTICE of APPEAL"

Notice is hereby given that the Petitioner in the above-named case, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the District Courts final order entered on March 23rd 2022.

(next page)

# Declaration Under Penalty of Perjury

The undersigned declares, (or certifies, or verifies, or states), under penalty of perjury that he is the Petitioner in the above action, that the information contained therein is true and correct.

28 U.S.C. § 1746 ; 18 U.S.C. § 1621

Executed at the Oklahoma State Reformatory, [PO Box 514, Granite Ok. 73547]. The invoking of the Prison Mail Box Rule(s) as mailed and signed on the 15 day of April, 2022.

Respectfully,

/S/ J. R

/Print/ Jesse Redfearn
Pro-Se litigant

P. 2 of 2

Jesse Redfearn #423248 D4-18-15b
OSR
1700 E 1st street
Granite, OK
73547-0514

OKLAHOMA CITY OK 730
18 APR 2022 PM 6 L



Att: Court Clerk
William J. Holloway, JR. U.S. Courthouse
Western Dist. of oklahoma
200 N.W. 4Th street
oklahoma City, OK
73102-3092

Legal Mail

RECEIVED
APR 20 2022
Clerk, U.S. District Court
WEST.DIST.OF OKLA.

73102-302699

Legal mail

*This Correspondence is from an inmate under the custody of the OKDOC. For specific information about the inmate sending this correspondence, such as: offense, projected release date, photo, etc., refer to our website at: www.doc.state.ok.us. Click on the "Offender information" link then the "Offender Lookup" link or contact OSR Records at (580)480-3700. Further, the facility is not responsible for the substance or content. Objectionable material may be returned to the facility head at Oklahoma State Reformatory.*